GRANVILLE H. VAUGHN ET AL *v.* G. W. EDWARDS ET AL.

**Guardian and Ward—Duty of Guardian to Make Proper Report.**

　　The purchase by a guardian, of a portion of an estate of a decend-
ant, and execution of his note therefor to the father of his wards, will
not relieve him of his duty to report the indebtedness to the proper
court as the estate of the wards in his hands.

**Purchase of Personal Property by Wards Credited to account of Guardian.**

　　Where minors, purchase at a judicial sale, personal property, of the
estate of which they are heirs and take possession of and use the same,
continually, their guardian should be credited against an estate under
his control with the amount bid by the ward's. Or upon an adjust-
ment of accounts said property should be turned in to the hands of
the guardian.

**Principal and Surety—Judgment against Principal Alone—Erroneous.**

　　In a suit on a guardian's bond, a judgment against the principal
alone, is erroneous. It should be against the principal and his sureties.

APPEAL FROM GREEN CIRCUIT COURT.

December 19, 1868.

OPINION OF THE COURT BY JUDGE PETERS:

John Edwards, a citizen of Green county, departed this life
intestate in 1842 possessed of a valuable estate in land and slaves,
leaving Mrs. Ann W. Edwards, his widow, surviving him, and
seven children, his heirs.

His daughter Elizabeth who had married Dr. A. M. Jones
perhaps in 1841 died in 1845 leaving her husband and two daugh-
ters, Velotte and Mary, of very tender years, surviving her.

Dr. Jones, on the division and distribution of the estate of
intestate Edwards, received in right of his wife, and before her
death, the one-seventh of his estate, after the assignment of dower
to his widow. Upon the death of Dr. Jones' wife, his children
were taken by their grand-mother, Mrs. Edwards, to her home,
and she cared for, educated and supported them till her death,
which occurred in 1865; perhaps the older one married a short
time before the death of her grand-mother.

Their father, Dr. Jones, was not successful as a business man, and prior to 1855 had failed, the estate which he got in right of his wife, except that which he might be entitled to on the death of his mother-in-law, was all gone, and as he claimed the right to the one-seventh of the dower slaves after the termination of the life estate, their grand-mother might well suppose that that remnant of their mother's fortune would be lost to them. Prompted by her affection for these grand-daughters, intensified doubtless by their misfortune in the early death of their mother, whose place she had hitherto filled, but which, her advanced age warned her, she must soon surrender, and their destitue condition when bereaved of her, she determined, if in her power, to secure to them this interest claimed by their father in the dower slaves; he was approached and her sons consulted on the subject; in her efforts to accomplish her purpose, she was informed that she must surrender her life interest in four very valuable slaves, worth nearly $1,200 each, and their annual hire, we are authorized to assume, worth not less than $500, who were to be sold and their price divided amongst the remainder men; this she consented to, the slaves were sold, and appellee George W. Edward bought from Dr. Jones the one-seventh thereof, and on the 12th day of January, 1856, eexcuted his note to him for $657.85-100, due one day after date; this note was executed after the four slaves had been sold under a decree of the Green circuit court; the transfer of Dr. Jones' interest in said slaves to said appellee had been made about one year before, as is shown by a writing signed by Jones and filed as an exhibit, dated 24th of January, 1855.

On the 17th of December, 1855, Mrs. Edwards, the widow, by a writing, released to the heirs at law of John Edwards, deceased, her late husband, all her interest in, and claim to, the services of said four slaves, and on the same day, appellee George W. Edwards was appointed by the Green county court guardian for these two infant daughters of Dr. Jones, and executed bond under said appointment with David W. Edwards and Daniel P. White as his sureties, for the faithful discharge of the trust of guardian of said wards.

In February, 1856, Dr. Jones sold his interest in the remaining dower slaves, retained by Mrs. Enwards, for $800, to George W. Edwards, and took his note therefore bearing date the 13th of February, 1856, due one day after date; and on the 5th of March,

1856, he assigned both of these notes to Mrs. Ann W. Edwards, for value received of her, as is explained in the assignment; these notes Mrs. Edwards retained until her death.

The wards having married, this action was brought in April, 1867, by their husbands, and them jointly, against George W. Edwards, and the sureties in his guardian bond, to compel them to account for the two notes executed by said G. W. Edwards to Dr. Jones, and the accumulated interest; the relief sought was resisted on the ground that nothing ever came to the hands of the guardian belonging to said wards, that the $800 note had been satisfied in slaves surrendered to the wards before their marriage, and upon the ground that they have no interest in said notes.

The circuit judge rendered judgment against George W. Edwards alone for the note for $659.85-100, and dismissed the petition as to the sureties, and to correct the alleged error for failing to render judgment for both notes, against said Edwards and his sureties, this appeal is prosecuted.

Although the plan adopted to effectuate the intention of the parties was not the most direct and skilful, yet they consulted a lawyer, and he seems to have advised the course pursued, and the evidence conclusively establishes the fact that Mrs. Edwards paid nothing to Dr. Jones for the two notes on George W. Edwards; they were not assigned to her in consideration of her care and expense in maintaining and educating her grand-daughters; she made no charge for that, and Dr. Jones proves that she gratuitously surrendered to him the note she held on him, after he had assigned the notes to her, and he proves the purpose for which the assignment was made, and the most incredulous cannot read the evidence in this case and avoid the conviction that said notes were placed in the custody of Mrs. Edwards for the benefit of her said grand-daughters. Why did she not collect, or attempt to collect, them; and especially after she ascertained that her son, the obligor, was in failing circumstances, if such was not the intention?

She certaisly could not have surrendered up her life estate in four valuable men slaves, over twenty, and under thirty, "*years of age*," to enable Dr. Jones to sell his claim to a reversionary interest in one-seventh of her dower slaves to her son, that she might be enabled to get his note to pay her claim for supporting and

educating his daughters; for the property she gave up was worth *more* than the notes.

But why did G. W. Edwards have himself appointed guardian for these infants? They are not shown to have had estate to the value of one dollar unless they could become the beneficial owners of said notes. And it is a fact of great significance that the very day on which the guardian was appointed, and his bond executed, Mrs. Edward's written surrender of her life estate in the four slaves was executed, which fully authorized the conclusion that the grand-mother would only execute said writing when the appointment of a guardian was made, who should be responsible for this small estate, which she was so anxious to secure for these children; it manifests her purpose, and no other motive for the surrender, and sacrifice, of her life estate in the slaves, is shown, or attempted to be shown.

Jones' cross-examination was elaborate, and vexatious, to get an explanation for the direct assignment of the notes to Mrs. Edwards, if his purpose was to secure them to his daughters, to which his answers are in substance, that the notes were to be held by Mrs. Edwards until the guardian made his report to the county court of their amount, and that he held the same as guardian, which he had promised to do. And it may be added, it was his duty to do it. Dr. Jones is fully sustained by B. Edwards, who purchased two of the four negroes sold, and proves that the guardian told him, when he paid him, his part of the money for said slaves, that he held his nieces' part as their guardian.

Notwithstanding therefore the efforts which have been made to obscure and change the true character of this transaction, it is patent from the commencement of its history to its close, that the notes of George W. Edwards were given as the evidence of his indebtedness to his wards, and were retained by their grand-mother for that purpose alone; and he cannot be permitted to escape responsibility on account of a dereliction of duty on his part, in failing to report their amounts to the proper court as the estate of his wards in his hands.

A sale was made of all, or a part, of the dower slaves in the life time of Mrs. Ann Edwards, which she may have procured to be done; under the belief it is true that George W. Edwards had failed to execute a guardian bond for the security of her said grand-daughters—and for that reason prevailed upon them, and

actually caused each one of them to purchase a slave at said sale with an agreement that George W. Edwards should have a credit for the prices at which they purchased them.

The slave purchased by Mrs. Vaughn she took into her possession, and upon her marriage her husband took him, and retained him until he was emancipated by the adoption of the constitutional amendment, that purchase was therefore ratified by her husband after his marriage. The one purchased by her sister was also taken and kept with her at her grand-mother's during her life, and then taken with her to her father's, where she had her services until the adoption of the constitutional amendment. And although these purchases were made by the young ladies while they were minors, by the direction of their grand-mother, under the mistaken belief that George W. Edwards had not executed the guardian bond which she had been solicitous about, still the slaves were sold publicly to the highest bidder, and it does not appear that George W. Edwards either advised, or was instrumental in inducing, them to make the purchase; they did it under the advice of their grand-mother alone, and he surrendered the slaves to them, and although they were afterwards lost to them, that happened not by any fault of George W. Edwards, or any defect of title in him at the time of his sale. If therefore the slaves had not been emancipated, before appellants could in this action have made George W. Edwards, and his sureties, responsible for the whole amount of the two notes, equity would demand that they should return the slaves to him. And as without any act of his, or failure of his title, the slaves were emancipated, it is equitable and just that in adjusting these accounts between these parties, appellants should be charged with the price of the slaves purchased respectively by Mrs. Vaughn and Mrs. Rose.

For reasons stated in this opinion, the judgment is reversed, and the cause is remanded with directions to render judgment against George W. Edwards, principal, and David W. Edwards and D. P. White, his sureties, for the amount of the two notes executed by said G. W. Edwards to Dr. A. M. Jones, and by him assigned to Mrs. Ann Edwards, with simple interest from the dates when they respectively fell due, and costs, to be credited by the amounts bid by Mrs. Vaughn and Mrs. Rose for the two slaves purchased by each of them, and the difference in *the* then

prices will be adjusted as between them in making out their separate claims.

*Spencer, Chelf, Lindsey, for appellants.*

*James, Towles, for appellees.*